We will hear argument in No. 23-2246, Elam v. Early, and Mr. Goldman, whenever you're ready. Thank you, Your Honor. May I please the Court? My name is Robert Goldman, and I represent the appellants in this case. This case, I believe, everyone will find to be fascinating. It's a case that involves... Go tell them to be quiet. Sorry, we'll make sure you get your time back. We just want to make sure we can hear. Thank you very much. It's a fascinating case because it's a case that involves history, it involves art, and it involves 100 years of jurisprudence by the District of Columbia as far as inter vivo's gift law is concerned. All those converge in this case to make it very compelling. I believe it boils down to something fairly simple. The question in this case, and perhaps, I believe the Court is probably aware of the background on this case. Okay, thank you. Is whether or not Grandfather Early, when he died in testing prior to dying in 1951, did he make an inter vivo's gift of artwork from Norman Rockwell to his daughter in 1949? Can I actually, I hate to interrupt so early, but I do want to ask a question because I'm not sure why that is the question in the case, and I want to give you a chance to explain. So at some point, and it seems to be undisputed, Helen had possession of the illustrations, which would seem at least to give rise to this presumption of ownership that comes with possession. And so at that point, isn't the burden on you to show that your clients actually owned, I mean, I'm not sure it matters anymore how Helen did or didn't get possession because we're assuming it was lawful. I believe it does, Your Honor, because somebody can have possession of objects which are owned by multiple people. People can have a possession by. So you're saying the presumption should not apply. Well, I don't think you get to the presumption if there was no gift. Let me explain that if I could. In this case, we have admissions by the appellee. Which leads to, I believe it's the foregone conclusion that there was no inter vivo's gift. OK, go ahead. I'm sorry. No, you go. Tell me if that is true. Yeah. And if if that's true, it doesn't matter because in 1951, if that's true, then by intestacy law, the sons and daughters receive two thirds of the artwork. They're still in the estate. Even if Helen didn't take them by inter vivos gift, how do we know they're still in the estate? There's an estate accounting and it doesn't have them. Well, there's there's many reasons why it might not be in. Well, first of all, and that's the point of the. But it's very hard to go back and figure out what happened. If it's not hard in this case, you know, that's the whole thing. Maybe, you know, I came up with one just off the top of my head. Maybe the grandfather gave them to the grandmother. I haven't mentioned grandmother gave them to Helen. Who knows? But the appellee never claimed that doesn't have to has the benefit of the presumption. You have to come in and explain why your clients actually own it. You have to provide evidence of superior title. And we've said in our cases, it's not enough to call into question the title of the person who had possession. You have to show that you own them. Well, I'm sorry. You have to show that your clients own them. But but at the same time, the the duty is upon the the donor who's claiming the gift to show clear and convincing evidence that there was a gift. And and your honor, respectfully, if if they acknowledge that Helen never took possession of the artwork until 1960, if they acknowledge that they had no evidence of of of of the gift otherwise, if they if they acknowledge that grandfather early was still in possession of the artwork when he died in 1951, as a matter of law in 1951, the intestacy laws come into play. And at that point in time, before Helen Elam ever comes into possession of them, they're distributed in 1951 by operation of intestacy law. And so in 1951, automatically, the sons and daughters become two thirds owner and the grandmother becomes a one third owner. And then going down the sequence of what takes place. So given given that at that theory, I guess a bunch of questions. But can I start with the question of the possession from 1960 to 78? It seems there's a factual dispute as to whether the mother or the daughter was in like actual possession for much of that time. There was a point in 69 where I think she had it, but the mother it was the mother's house. Right. It would be odd to think when the mother goes to the hospital that the mother's house then becomes the daughter's possession while she's still alive. It seems like the things in the house remain the mother's in the mother's possession. The fact that she's in the hospital. If you put me in the hospital, all the things in my house don't become my wife's immediately. Right. Well, I would I would hope not in my case also that that if I go into the hospital, if I go into the hospital for whatever reason and I collect Teddy Roosevelt items and I go in the hospital, no relative of mine owns my collection. They're mine. I'm still alive. I'm still kicking. And you're still effectively in possession of them. You are in your house. Yes. You are in a hospital, but they're still in your house. You have possession. Absolutely. So. So what. So I guess the question is, why do we think you talk about 1960 that Helen had them in 1960? But it seems like to me Mama had them in 1960. There's a debate about a little period in 1969. I totally get that. But then they returned to Mama in whatever year it was. So years run together. Right. Yes. But so that means that at least for most of the time period between 1960 and when it goes to the White House, like Mama's got it, not not daughter. And under the presumption of possession, if they're arguing that since Mrs. Elam was in possession a certain time later, well, why don't we give the presumption of possession to grandfather early? Is that how it works? That's an interesting question. I thought about that. I mean, we might would have. But the presumption doesn't divest. As I understand it, it seems to me that the presumption applies if someone in possession claims ownership. The fact that it may have we may have shown possession by someone else doesn't mean we don't I don't think apply it now. In other words, grandma early could have claimed it and would have gotten the benefit of the possession during the time she possessed it. Yeah, there's a question of whether she did or whether it was Helen's and she went to live with them. But maybe maybe I'm wrong about this. But does the does the fact that the presumption might have applied earlier? Is there any law that says we don't then consider it later in time when someone else possesses it? No. I mean, obviously, you can consider adverse possession changes title. But that's this is just a presumption. Then you go and have the ability to produce. Right. And that's why I think this goes back to what Josh Harris is talking about. It's a rebuttable presumption. It's called a rebuttable presumption. So Helen has it and we rebut it by saying, but but no, she's not the sole owner of it because of the intestacy law. She's not the sole owner. But but that's it. I hear you. So let's let's talk about that. Sounds like you're saying the presumption applies. And the question is whether you've rebutted it showing superior title. Is that am I am I correct? I'm missing one step. I contend, first of all, since they've acknowledged that the elements of the gift law in D.C. were not met during the lifetime as a matter of law that was distributed in 1951 under intestacy law. Secondly, they claim the presumption. And then we argue, if you're going to apply that presumption, it's rebuttable. And we rebut it by our evidence of what happened up to 1951. And we rebut it because of it being at grandmother's early house, according to our testimony, all the time, all the way from 1951 to 1978. When she died that entire period of time, except for a short period of time because of water damage in the basement of the house. It went into Apple's mother's house. Can I follow? I don't mean to cut you off, but I'm just trying to. So I just want to get your first argument. That seems like where you put most of your eggs is that we don't have to do the presumption because of the absence of an inter vivos gift. And that's kind of a legal question. I got that. I'm moving past that to your, it sounds like your alternative argument that you've shown superior title. And when I looked at the briefs, I didn't see how you proved that. It looked to me like your position was all that first argument. You have a discovery response where you have a lot of stuff about representations that Helen made and that questions were asked by these folks or not. But I don't see any of that in your briefs, on appeal or below, to say that's how we showed superior title. Am I right about that? I'm a little confused, Your Honor. I missed the import of the latter part of your question. Yeah, I'm sorry. When I read the record, I read the discovery response that talked about various things that Helen had said to her siblings and maybe to her nieces and nephews and that had been said to her sister-in-law and various people in the record. But it didn't look like you argued all that indicates superior title to me before the district court or before us. It looked like your superior title argument was hook, line, and sinker to say there was no inter vivos gift. I believe you're correct that that is what we consider to be a rock-solid winning issue. But aside from that, we did deal with a rebuttable presumption because we did put evidence in there that, according to the appellee, the mother came into possession in 1960, according to our witnesses, short period of time in 1969. And then the grandmother dies while the artwork's at her house in 1978. So in 1978, we've rebutted it because that evidence, at least to go to the jury. So I thought your argument earlier was the evidence you put on of your title is the gift from Rockwell to Granddad, right? And then Granddad dies in test date. And so by action of law, in test date, goes to the three folks, right? And, well, I guess the three kids plus Grandmama, right? Grandmama maintains from 1951 on. She maintains the painting.  And so then it passes by virtue of wills to the various people that play. That's your evidence of title. Right. So you're not just calling it a question theirs. You have your own affirmative evidence of title. And in addition, you then show why it's better than theirs because you attack their argument as well. But you're not just attacking their argument. You have your own evidence of title. Thank you for doing a better job than I did. Can I ask you then, because the district court, at the end of the opinion, and I was wondering what you made of this. After the presumption discussion says, in addition, I've looked at all the estate documents. I've looked at everybody's will. I've looked at the estate accountings. And those documents show, and I think the district court says conclusively, that Helen owns it. Because it's not in the estate accounting. It's not in any of the wills of the people who died with wills where you would expect to find it. There's no explanation for why it wouldn't be in any of these documents. The only person in whose estate documents it shows up is Helen. So I'm looking at that evidence, and I see that Helen has superior title. Well, in 1978, when Grandmother Early died, her will says, I give my objects of art to be divided amongst my three children. I hope they get along and can figure out a way. Is that the stuff that was valued at $3,000? That's correct. And I also went, for you to take judicial notice, you'll find out that cars at that period of time were selling for a few thousand dollars. In 78? Is that when that is? That's 1978. Yeah. Okay. That's 1978. So your position is that her will is kind of general. It doesn't lay out all the assets. But we have the detailed acknowledgments that are in there. None of them mention the art, right, specifically. None of them mention the rock works. Not by title, no. Yeah. And so, you know, your argument is that that reference that totals $3,000 covers these pieces of art that y'all have argued below and are up here on the Fourth Circuit arguing now and paying lawyers to do this much. But I think what's really important about this is there's no law cited by the other side, and I know of no law that says if somebody doesn't in detail list their assets in the estate property, you forfeit that property. That's completely fair, but you would think if your argument is that they went and test stayed to Helen and the kids, and then when those kids died, you would think their wills might have mentioned them. They don't. I mean, they don't say, look, I got a third interest in these very valuable Norman Rockwells. Stevens don't. Thomas's don't. One died in test state. So, yeah, one died in test state. But I thought you'd just say, you're right. That's evidence that cuts against us. And, you know, we think at some point some fact finder is going to have to determine that. Yeah, a jury decides that. If we got evidence this way, they got evidence that way, what do we do with it? Exactly. The reason why I think we're entitled to a jury to decide that is because there's no law that says that people who fail to put things in detail. I mean, I think it's common sense that a lot of us who have had parents die, I leave to my children all my personal belongings. It doesn't mean that. I thought the grandfather's estate accounting was really actually very detailed and specific. And that's why the district court thought it just didn't make any sense that it would be missing this one object when it had gone through in great detail all the other objects. Also, we're getting into congestion here because there's also, for what we, if we're guessing at things, we're surmising. I'm literally just, I want you to address what the district court said. Yes. That's sort of how I started my question. What do I make of that second part of the opinion, which seems to be independent of any presumption, where the district court just goes through the estate documents and says, not only can you not rebut the presumption, but your argument is rebutted by the documents? Let's not respectfully say that it's not rebutted by the documents. It's not supported by the documents, but the absence for tax evasion. You think you can rebut the presumption even though the argument is not supported by any of the estate documents? Right, for everything else that we already discussed. And that is, again, I just, that is the absence of the inter vivos gift. In the absence? That is what rebuts the presumption. It's not any of the estate documents. It's the absence of an inter vivos gift. There's also things that rebut it. There's a conversation between son Stephen with the appellee and his mother Helen. But you didn't argue that. Maybe you make that now, maybe we consider it, but you didn't brief that. I did, Your Honor. Where? On rebuttal, will you show me the page where you argue those things?  Yes. We've run you way over your time, and you have rebuttal time. Okay. Thank you very much. May it please the court. My name is Philip Harvey, along with my colleague Paris Sorrell. I represent William Elam in this appeal. And we ask that the court affirm the decision of the district court. The issue, obviously, is who owns the Rockwell illustrations. There are four of them. Virginia Supreme Court gives us the framework to follow to make that decision. In the Maine v. Adams case, when the dispute arises as to who owns personal property, the court tells us to look to possession as prima facie evidence of ownership of the property until better title is proven. And this common law presumption of ownership based on possession requires that the party not in possession of the disputed property produce evidence of superior title. So once my client... Can I stop you there to talk a little bit about the presumption? So I don't see anything in Virginia on this, so I want to concede that up front. But when I trace this possession as being prima facie evidence of ownership, or a presumption of ownership, the case law and history of that suggests it does not apply to jointly owned property that cannot be physically divided. Because the possession in that instance is not inconsistent with the joint ownership. So the Supreme Court describes it and says that possession is evidence of some kind of rightful ownership or title. And so yes, this is... I want you to respond to yes, a presumption shows that Helen had some rightful ownership or title, but it doesn't show or doesn't apply or doesn't give any presumption of absolute or sole ownership. It just shows that she's an owner. And that each case that Virginia has applied this presumption is a case in which the possession is inconsistent with the alternative claim of title. That these are two titles that have to be inconsistent. But the other courts, so when you look at other places like Missouri and Illinois and the U.S. Supreme Court's own description of this venerable principle, it doesn't suggest that it applies to jointly held property that cannot be physically divided. Help me understand why you think Virginia would adopt a broader presumption than seems to be in the common law. Well, first, you look at the language of the Virginia cases, which obviously don't make the kind of exception you're looking for. And then you look to this case. But you agree, they don't address that, right? That's right. Yes, it is true that everybody says, you know, the version of that here is that possession is a presumption of ownership. And that is true. I agree with you that her possession, if it's true, that she possessed it from 60 to 78. And we can debate that. But it shows, it does provide a presumption that she had an ownership interest. I totally agree with that. But does it show anything about that ownership interest being absolute, sole, as opposed to joint? And that's the trouble that we have. It comes up in marriage cases. It comes up in all kinds of contexts where you have joint ownership of physical property that can't be divided. I agree. I've not yet seen Virginia deal with it. But it seems odd to suggest by silence that Virginia has expanded the sort of common law rule. Well, I don't know about the common law rule. I mean, I haven't read the cases from Missouri and wherever the court is discussing. But in this case, when the issue is possession, I mean, my client and his mother before him had sole possession without a peep from anybody. But I understand that. But mine's a theoretical point, right? So I'm conceding for purposes of this discussion that there was sole possession, right? But it's not inconsistent with joint ownership, right? Right. This isn't like corn that we could just, like, divide up. Everybody gets their, like, prorata share. Sure. This is a single item. And even if everybody agreed that it was joint possession, somebody's got to have it. Sure. Right? And so in that context, why do we think that there ought to be any presumption based on any one joint owner's possession? That's what I'm trying to get at. All I can say is the cases in Virginia discuss possession. They don't discuss this exception. And beyond that, I don't have a reason for the court to come to that conclusion. But that, I mean, it's an interesting question. And as I have looked at some of it, and certainly I don't profess to have a complete understanding of all the historical analysis, it might apply that the, quote, exception, if that's what you call it, might apply with greater force. If you have property that on its face is jointly owned.  Like a note that's payable to two people. Sure. Then possession of a note that's payable to two people, you know, it would be pretty hard to say my possession of it gives me some leg up. I'm not saying that's the only situation when that historical exception applies. But, you know, if you take that further, and maybe that's where we go, it would give the non-possessor who claims joint ownership a substantial advantage in overcoming what people use in a whole lot of cases to establish at least a tiebreaker. Sure. The non-possessor could just say I own half. Therefore these presumptions don't apply. Go prove it. Can I? And that's the problem with coming up with a claim that you own property after having been silent about it for at least four decades. Does, I also had not read the Missouri cases, but did this come up before the district court?  Okay. This was not argued. This was four illustrations, right? Yes. So no one had to cut any paintings in half. It's a panel. If you put them next to each other, it looks like a continuous scene across the four illustrations. Okay. Sorry. But the point is that the defendants' arguments below were forget the presumption. It doesn't matter. You have to prove that there was a gift in 1949. And we said we can't do that. We can't come up with donative intent by a man who's been dead for 70 years. But we don't have to. You do. You've got to deal with that, not us. So I want to interrupt you, and we've read your brief, so I don't think the fact that I'm interrupting you doesn't mean we don't understand your argument. But I'd like you to respond to what your colleague seemed to accept was an alternative position, which is, okay, the presumption applies, at least, you know, arguendo. We've established a genuine issue of material fact of superior title by virtue of the gift to Grandpa Early and the fact that he died intestate. And I guess the fact that Grandma's will didn't specify anything. Does that, and I may have left out some part of that position, but what's your response to the question of, well, that's at least a genuine dispute of material fact on superior title? No, it's not. They have to try to prove superior title. But they say that does that. Right. But what they point to is, you've got to prove, you, they say, we have the burden to prove about a gift. We do not. I got that argument. Okay. Let me frame the question. So there's this first question of whether you have to prove it or not. You're welcome to keep arguing that. I'm not as interested in that.  What I'm interested in is your response to their position that we accept we may have a burden. We disagree, but we're conceding if that's true, we've maybe not established it once and for all, but we've overcome the rebuttable presumption for purposes of summary judgment. They have not, because other than talking about the gift, they effectively offered nothing. The estate of Grandfather Early did not, he got intestate, did not include the rock quilts, although they were so important, and the estate, the inventory got down. Whether the estate included it or not is a legal question. It may be that the documentation did not include it, but whether the estate included it or not is a different question from whether the documentation included it or not. That's right. That is a different question. But evidence of what these people thought and what the facts were tends to derive from the estate. And it may tend to derive from it. I understand that argument, but that's a factual debate. We can have a question about whether it's inclusion or not, cuts one way or the other, but the question is why is that not a question of fact for a fact finder, which might end up being the judge anyway, but put that aside. Because on summary judgment, they've got to do something more than speculate. They're not speculating at all, right? This is the question that Judge Quattlebaum asked, right? Evidence that Judge Quattlebaum gave you, why is that not sufficient to raise a question of fact as to who has superior title? They have a title story. You have a title story, right? And so now they put forward affirmative evidence. You have affirmative evidence. But now we've got to decide which one of you is correct. Their affirmative evidence doesn't show anything about title. You say that the estates may in fact legally have included the Rockwells or interest in the Rockwells, even though they don't show it. Well, they've got to come up with some evidence. And what they have is a series of estates, none of which mention the Rockwells. Grandfathers doesn't. Grandmothers doesn't. And the two brothers through whom they claim, their estates don't either. And isn't that the point that this story that they may have, dying in test state, doesn't cut one way or the other? I mean, they can use it, but it's not inconsistent with the gift necessarily either. What they have, your argument seems to be, yeah, they got a story. He died in test state. The wills may be cut against me. That's a genuine dispute of material fact. The response, I guess your response is, that's not enough to create a genuine dispute of material fact. That's nothing. They say that the gift was made. So what do you then do with Grandma Early having it from 51 to at least 60, right? Because that is consistent with the notion that it passed in test state, right? The fact that Grandma kept it, right? This is the whole point of the inter vivos gift, but I'm not trying to make that argument. What I'm saying is, it's not that there's nothing in the record that suggests that it passed it in test state, right? Because it then went to the person we would think it would go to if it was Grandpa's to begin with, his wife. Well, if it was Grandpa's to begin with and passed in test state, his wife only got a third. The kids collectively got two thirds. That's correct, but it's one piece of art. Judge Harris might be right. It's multiple panels, but it's one piece of art. You wouldn't naturally take a multiple panel painting and divide it into pieces and spread the pieces out, right? It's much more valuable as a single piece of art than it is multiple. Grandma gets it. But that's also consistent with the allegations that were made and backed up with an affidavit that went after the gift was made in 1949. It was a recognition that the recipient of the gift, the daughter, didn't have a place to put these things. And you might be right. The point is, like, okay, that's your evidence. That's his evidence, right? A fact finder gets to figure that out. I have lost track of where we are in the argument. Are we assuming now that there is a presumption? Yes. Okay. If we're assuming that there is a presumption, why isn't your answer, like, maybe if we were starting from scratch, like, oh, who knows what happens? That goes to a fact finder. But how can who knows what happened defeat a presumption? That's right. What work is the presumption doing? That's the point. There is a presumption, and they have to do something more than say, well, a lot of things could have happened. Totally fair, right? And so a fact finder would have to say, there's a presumption here, right? But still they get to determine, did they overcome the presumption, right? And so that's the factual question. The bar is a little bit higher, right? The tie goes to the runner, right? I get that. And the district court looked at all the evidence. Well, he didn't look at all the evidence. He looked at all the evidence that they presented. At summary judgment. At summary judgment. That's the time to future cut faith. If you don't have the evidence on summary judgment, you lose. Well, I agree with that. And so I think they have to have done enough to overcome, you know, to show superior title. And we've been debating that a little bit as to whether that, whether they've done that or not, whether they've, you know, created a genuine dispute or not. Your position is they haven't, and I take that to be the case. Or I take that, I understand what you're saying. I have a record question.  I've read the briefs and I've reread them to try to make sure, and maybe I'll get some illumination on rebuttal about the argument of information that's in the interrogatory response. Yes. That's where the earliest list, a lot of stuff that happened through the years and statements and things like that. Yes. At summary judgment, aside, was affidavit or deposition testimony of any of those conversations, was that produced? Yes, there was deposition testimony, but it doesn't support what the defendants say it does. In 1960, there's a letter where Mother Early, plaintiff's mother says, my mother gave me these, the Rockville drawings in 1960. And our affidavit said that she had them in her house on Marlin Drive in 1960. They then say, well, in 1969, there's an issue. That's the hearsay recollection 50 years later of someone who was seven at the time, who has no personal knowledge, who said first, do you remember what happened in this conversation about the paintings? And he said, no. And then two pages later, he gives this discourse about what was said, which all goes to moisture. It doesn't talk about he has personal knowledge of where the paintings were. It doesn't say that. This is a 70-year-old kid. I asked a bad question. I'm cutting you off. It's your answer to my question. Who testified in their depositions? Michael Early was the one who testified about what happened in 1960. At the time of discovery in this case, the children of Grandma and Grandpa had all died, isn't that right? Yes. Had their wives, had Patricia, who was married to Thomas, died? Yes. They were divorced. Did she testify? No. Okay. The wife who was still alive was Suzanne. She's a defendant, but she's suffering from, I think, Alzheimer's. So her daughter, Andrea De Leon, has the power of attorney signed things. Okay. I'm sorry to get you off track. That's okay. In 1960 to 1978, the court said I'm able to find, from 1960 to 1978, she has possession. In 1969, Mother Early moves from- Do you agree with this idea that if I live in my house and I'm sent to the hospital, that whoever happens to be living in my house at the time now takes possession of all of my things? No. But they were hers to start with. But that assumes the answer, right? No. No, it doesn't. Mrs. Elam, the plaintiff's mother, my client's mother, moved from the Marlin Drive house to Hoover Lane in 1969 and brought the paintings with her, moved in with her mother in her mother's house. That doesn't make them her mother's paintings. She moved in with her mother. When her mother moves out because of the stroke in 1972, that doesn't change. This is your argument that she had them from 1960 to 1969 or eight, whatever it is. 1969 in her house, yes. And you think that evidence of that is uncontroverted, right? Yes. That there's no factual dispute. There's nothing they say- That she had the possession of the paintings living in a place without her mother. Yes. And in 1969, there was this conversation. They say places them someplace else, but the court properly disregarded that as hearsay. And their answer is, well, it goes to the grandmother's state of mind. Well, the grandmother's state of mind's not an issue. And that's the ultimate fallback, Your Honor. And I'll ask your colleague this. Is there evidence of that conversation, Michael's recollection of it? Michael's recollection. He was a 70-year-old boy at the time. And 50 years later, first he says he doesn't remember anything. And then he says there was worry about moisture. He said the paintings were in the house. He doesn't say how he knew that. He doesn't say he had personal knowledge. Just as a 7-year-old, he said grandma was worried about moisture. I understand, Your Honor. And it was all disregarded properly by the district court as hearsay. And so they stay there in the jointly residing house. But that doesn't mean when you move in with your mother, she doesn't assume ownership of what you bring with you. And so they stay there until 1978. In 1978, they're loaned to the White House. And they stay there for the next 40-plus years. And nobody on the other side says a peep. Nothing for 40 years. They stay there. Nobody says a word. When Thomas Early sees them in 2017, he still doesn't say anything. Just so I'm sure that I follow this. I understand their evidence between 60 and 69. What is your evidence that Helen, who I think you're calling Mother Early. Mother Elam. Elam, sorry. Whichever one it is. Let's call her Helen so I know who she is. That Helen had possession of the panels in a residence that her mother was not in from 1960 to 1969? What do I look to for that? I think it's a declaration of Mr. Elam. And how does Mr. Elam know that? He was the kid. He was there. So we're disregarding one 7-year-old kid and accepting the other 7-year-old kid? No. We object to their evidence. They didn't object to anything we offered.  But what you're saying is that I have to look to. I just want to make sure I understand. What I'm looking to for your evidence is Mr. Elam's testimony as a kid that the panels were in his mother's house at a time when Grandma did not live there. Right. And. Can you by any chance. I'm not trying to hold you to this. Any chance you can tell me where I can find that in this record? I don't have the page number in front of me. But the other thing is the letter that Mother Elam wrote to the Rockwell Museum in 1960 that said, my mother gave me these illustrations. But you get why that's like inconsistent with your story? I think that's a great example. Right. So yes. But if that's true, that suggests that Mother Elam got the paintings in 1951 so that she had title to provide them in 1960. Right. And that is inconsistent with your story. Right. It's also. That's an alternative argument. You might claim I got them from my mother, but that's not been the argument that you've made. So if we look at that letter, that letter helps the other side, not you. I think that letter helps me because the other way to look at it is that letter is consistent with the illustrations going to this woman as soon as she gets to the house where she can put them up. And she says, my mother gave them to me. Her mother, in fact, did give her the paintings. Here, you take them. You take them. It wasn't like a donative intent. It was I've been holding these things for you. Now you take them. All right. So a jury could buy that story. But it seems like a jury could well read the letter a different way. The issue of possession of these things and inferences, this is going to be a non-jury trial for that part of it. The common law claims are gone for a variety of reasons we haven't discussed. So can I ask that final question? Sorry, with your indulgence. Hypothetically, I get, except we disagreed with the grant of summary judgment and it went back. Could the district court decide to try the jury trials, the jury claims first? Because the jury has a right under the torts to decide ownership. And then the quiet title action, which is a judge question, he could take advice and counsel from the jury on that question? He could. It's not necessarily a judge question. It could be, but it need not be. It could be tangled up with a Ross versus Bernard jury judge. But the common law claims, for a variety of reasons, they're all gone. I understand your arguments on those. I wasn't trying to raise those. I just wanted to make sure. So when they're gone on remand, there's nothing but a judge trial. And it's going to be the same judge looking at the same facts. And I'm sorry to go a little longer, too. The judge also could ask the jury for an advisory verdict. But it seems to me your argument that the same judge is going to decide this if we were to hypothetically send it back is flawed. And that's because the Earleys may have put their eggs in the no inter vivos gift basket. And that may prevail or that may not prevail. But at least there might be evidence of all these admissions that they say Helen made through the years that the judge didn't really consider because those weren't the strategy they went through. I don't know if there's good evidence of that or not. There wasn't admissible evidence of admissions through the years. I got you. You're arguing that it would be a bad argument. My only point is it's an odd thing for us if we were to hypothetically say summary judgment should have not been granted to say we know what a fact finder would do below. It seems to me your argument needs to be no genuine dispute of material fact. That is my argument. And the wrinkle is to the extent that you have to draw inferences from documents that are just cold on the record, the district court can do that on summary judgment just as well as he can do that on a trial. But the inferences have to be drawn in favor of the non-moving party at summary judgment. Right. So he can do so, but what he can't do is do what he did here and draw them in your favor. Well, I don't think he drew them in our favor. I think he drew them the only way he can. He read them and read what they said. That's all. Thank you very much. Thank you. I have a lot to address here. I say I have a lot to address here.  Seven minutes. Mr. Alem's affidavit that counsels talked about that his mom had no room to put this, he wasn't born then in 1949. So how does he know why she had it or didn't have it? And when the father died, he was 10 days old. So that affidavit is meaningless and was just provided at the time of the summary judgment motion. The 1969 conversation by my client, Michael Early, says that he saw up until 1969 the illustrations in Grandma's home. So there is counter evidence that's not 1960. The four-panel discussion, they are four separate panels. Is it smart to divide them? No. We offered to get together and see if we could auction them all together to maximize the benefits. But can they be divided if everybody is obstinate? Yes, they can be. Middle Eastern, I think they're called Tri something or other. I forgot right now. Ultra panels have been divided over the centuries and go to different. It's not wise to take something apart, but it can be divided. So it can be divisible. So it's available for court action. If we were to win a trial or win here and the clients cannot resolve this, then it goes to partition and things are divided unless there's an agreement, even if it's not a good thing to do. Judge Harris, when you asked me about where was the discussions, you know, between which go to rebutting the presumption. Yes. If we go and I'll just cite these paragraphs rather than read them. In our initial brief at page 17, paragraphs 36 to 41. In our reply brief. And that includes the discussions of Michael Early and also Steven. So let me jump in because I think it was might have been me who asked that for you to give it to us on reply. And I think you're right. No worries. I'm sorry. Completely fine. I'll take that as a compliment. I confuse them all the time. I think it's fair to say you had a number of paragraphs in that factual session that you referenced some of that. I guess, Michael, but in the arguments that you make, are you going to refer to me in pages in your argument where you argued those facts in the argument part of your brief? No, but I'll do that if the court wants that. These are facts of record. I'm trying to figure out if you made an argument to us or the district court that those facts rebutted the presumption. And enlisting them as facts may be a start, but usually that's part of an argument that you rebutted presumption. I would look in your argument and see, okay, here's where I incorporate those facts into my argument that I rebutted the presumption. Yeah, and also the briefing in that case also. Judge, I'd be glad if you gave me a couple weeks to review a letter of citations. I don't want to. We got the briefs. I don't believe that I, for the first time, raised anything. Okay. All right. We have your briefs, and I appreciate that. I think I know what's in there, but I'll double check. And also, one last thing, because I still have a little time. I still go back that inter vivos gift, and we have established it. Page 11, paragraph 6, the defendant admitted that the illustrations were at grandfather's early residence between his receipt in 1943 until he died. Paragraph 8, the appellee admits he has nothing in writing to show that there is any gift to the mother. Paragraph 9, the appellee admits that his mother married in 1949, moved to St. Louis without the illustrations. Paragraph 10, admitted by appellee, appellee's mother did not take actual possession of the illustrations. I know the admitted facts. Can you, just as long as we're talking about the inter vivos gift and whether there was one, so your colleagues cited a bunch of D.C. cases saying, well, you don't always have to take actual delivery. Sometimes there's constructive delivery, and that will work. And I didn't understand you to be disagreeing with that in your reply brief as a matter of law. Just let me finish, and you can tell me if I read it right. But more to be saying, well, there are no facts here showing constructive delivery either. Yes, Your Honor. But even more specific than that, those are very narrow cases. I mean, they're talking about constructive possession. It's, hey, Johnny, I have a safety deposit box. I'm putting bonds in it, and here's a key to it, constructive possession. There's a case that talks about putting something in a trunk of car and giving access to the person. Right, I looked at the cases. The cases say, like, right, you have to, like, done whatever is sort of practically reasonable.  Right, but I guess the argument here would be she's got nowhere to put the stuff, right? And so this might work as constructive delivery. I would say it doesn't. I totally get that you would say that it doesn't. I'm just trying to figure out, are you, I did not read your brief to be arguing with the statement of law in your colleague's brief about these D.C. cases. But rather to be saying, on these facts as we know them, there was also no constructive delivery.  Okay, thank you. That's correct. I had something else to say to you. I'm sorry I cut you off, but I did want to just clarify that, take a minute and think about it. I think I might have covered. Thank you very much. Thank you. I appreciate your time. We will come down and recouncil, and then we can adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Pamela A. Harris, Julius N. Richardson, A. Marvin Quattlebaum Jr.